## IRVING AIR CHUTE CO., Inc., v. SWITLIK PARACHUTE & EQUIPMENT CO.

District Court, D. New Jersey.
April 7, 1934.

---

**1** No opinion filed.

402

Charles Neave, of New York City (Alexander C. Neave, of New York City, Roy R. Rommel, of Washington, D. C., and Charles H. Walker, of New York City, of counsel), for plaintiff.

Wall, Haight, Carey & Hartpence, of Jersey City, N. J. (John F. Neary and Daniel L. Morris, both of New York City, of counsel), for defendant.

CLARK, District Judge.

The customary patent case and the customary feeling of futility. That feeling comes from our almost perpetual disagreement with the Patent Office. Because of this continuity in difference, we have held this decision as long as we could without delaying the losing party's opportunity for a hearing in the court above. Either this court or the Patent Office has maintained a high average of error. In fact, the minor patent in the case at bar is the first that we have found to be valid. This may be due in part to the fact that only what might be called the "grey" patents are litigated. The Office decision as to the "white" ones is accepted, and no one will spend any money on the "black" ones.

This last statement is, however, very much of a half truth. The danger to commerce and industry lies in the very fact that the "black" patents, as we have called them, can be turned into "grey" ones by the interested. Just as any accident can be made a profitable source of revenue, so any grant of a patent has a nuisance value in its field. It was testified without contradiction that the inventor of the principal patent, in the principal case had offered to sell the application on that explicit basis for $500. The fact that it was purchased for twenty times that sum plus a sevenfold yearly royalty by this plaintiff is an indication of how much of a nuisance it has become. It will be understood that no criticism of the latter's very able and learned counsel is intended. Rather pity, in fact, because he is faced with the necessity of deciding that most delicate of questions—shall we fight or pay tribute? A fight he enters handicapped by absurd and illogical presumptions attaching to the grant.

If that question has to be answered too often by industry and its patent advisors, the patent system has been perverted from its high and constitutional purpose of the promotion of useful arts to the exact opposite. If it has been so perverted, the fault lies principally in the court of first instance for patents, the Patent Office. We have the impression that the Supreme Court of the United States is gradually convincing even the so-called "validity" circuits that there has been this perversion. That conviction does not yet seem to have reached the Office. We have a new Commissioner there. Perhaps he will give us a "New Deal" in Patent Office decisions too. If he does not, we are left again with the rather unsatisfactory method of action by the people's representatives.

The art of the patents relates to the latest phase of the solution of the problem of moving from place to place (transportation), popularly known as the "conquest of the air." As a matter of fact, it concerns the method of compensating for the failure to achieve victory therein. Less rhetorically, it has to do with parachutes. According to the books, the first parachute was invented for a more prosaic purpose. It was to be used as a portable fire escape and was demonstrated in 1783 by one Sebastien Le Normand in a descent from the tower of Montpellier Observatory. Two years later, the art and that of balloon ascension was combined by one Blanchard. He first tried it on the dog (placing one in a basket attached to a parachute and released from a balloon). The dog landed safely, but in his own later descent (1793) he broke his leg. Blanchard was followed by a Frenchman, Garnerin, who made so many descents between 1797 and 1805 that he may be accurately said to have shown the parachute's practical value.

In these early ascents the parachute was attached to the balloon in exactly the shape in which it was to be used. We can all of us remember the lady at county fairs coming down out of the sky hanging by her teeth. In such performances, there was no need for

economy of space. In balloon flights and particularly in airplanes, there was need for such economy and the parachute had to be folded up. This was accomplished through packing it into a container which could be opened when the jump was made. At first the container was attached to the balloon or plane. This manifestly handicapped the movements of the aviator or balloonist. The improvement to avoid this difficulty fastened the pack to the body of the jumper. Any packed type of parachute must of course be opened before it can operate. In the attached type, the pull of the harness accomplishes this. In the body pack, there has to be some means exterior to the jumper. The means used was known as a rip cord. By its operation, the cover of the pack is detached and the parachute canopy released. This rip cord was originally, as in the case of the pack, fastened to the plane or balloon. This was because there was doubt about the human factor. When it was finally established by trial and not (fortunately for Mr. Irving) error that a rapidly falling man retained possession of his faculties, the rip cord was attached to his harness, and thus the free type manually-operated parachute came into being. In all this development additional problems arose. The plaintiff's patents represent an attempt to solve two of these problems.

We have not given the chronology of the later stages of the parachute art. Quite obviously it would be and was stimulated by the progress of aviation in the war. The writer of this opinion remembers very clearly consoling artillery observers who had been forced to jump from captive balloons at the front. He remembers one young officer, who had served with the French, telling of being kissed on both cheeks and being given another palm for his croix de guerre at each landing and the same young gentleman's indignation at the unsporting attempts of several Boche aviators to plug him with machine guns on his way down.

This officer had very little experience with American combat planes. It was largely confined to lying in a ditch and wishing that there were some about who might possibly distract the aforesaid Boche from their assiduous strafing of the roads by which it seemed essential to move the Eightieth Division Light Artillery forward. He cannot say, therefore, to what extent our air service was supplied with parachutes. The record indicates that General Pershing cabled home for some action and that the Armistice found, as in so many cases, that action in its initial stages at McCook (now Wright) Field

(where many of the personalities of this case seem to have served at one time or another) in Dayton, Ohio. To digress for a sentence or two. The late unpleasantness has one bitter lesson for us. Improvisation for war (or for carrying the mail) won't do, as to supplies or, even more vital, as to discipline. Yet the tendency on every hand has been to play down and minimize that teaching. Far better to diminish our past self-esteem and save our future generations.

After the war, various companies were formed for the purpose of continuing this wartime development and adapting it to serve the growing commercial aviation of peacetime. Two of these companies are parties in this suit. Both companies make and sell the standard government parachute pack to the United States. The Irving Company sells a similar pack commercially. The Switlik Company sells commercially a somewhat different pack. It embodies the feature complained of in this suit.

The creation of the free type parachute (whether automatic or manually operated) necessitated the immediate solution of one important problem—that of the packing and emergence of the shroud line. The form all parachutes exhibit, even the earliest, is well-known. They require a canopy and a means of attaching it to the passenger. In the current parachutes there are twenty-four such means (known as shroud lines) and each is sixteen feet long. This is a considerable amount of cordage to be stowed in a narrow compass (circa nine square feet). Because the space is restricted and the lines many, they may tangle both in the pack and in the air. This court is inclined to think that this difficulty has been overemphasized. The court can see that an entanglement which will bring the lines out unequally may result. Such inequality will result in jerks and shocks to the aviator. Our inventor seems to have had this in mind, because we find him saying at page 33 of the file wrapper (Ex. D–AAA): "The combination with a parachute—of means to lessen the shock caused by the sudden opening of the parachute, comprising tight pockets out of which the lines are drawn under increasing friction as the full extent of the lines is reached." We should rather doubt that lines fastened to heavy objects at both ends can tangle in any but a momentary fashion.

However that may be, aviators quite naturally want to prevent such shocks. We see them first placing paper between the coils of shroud lines in the pack. This pragmatic

solution was soon followed by a more elaborate procedure. As might be expected, this next step was quite thoroughly and internationally patented. It consisted of a physical separation of the lines. Each of three patents accomplished this separation a little differently. In the American patent to Captain Van Meter (one of the McCook Field officers) the shroud lines are sheathed in paper and coiled in helical grooves in the base of the pack. The coils are tied with frangible threads. The English patent to Calthrop indicates a bunching of each separate shroud line, the bunch kept together with a heavy elastic and fastened to the pack cover with a lighter elastic. These elastics are broken in rotation. The German patent to Oister also suggests a coiling, but of the individual lines in tubes in the back. So we have a physical separation of the lines accomplished variously by grooves and threads, elastics, and tubes. In two of the patents, each line is treated separately; in the other, the lines are bunched or bundled.

It is believed that these three patents exhaust the prior art. Do they anticipate Adams? Before answering that question we must first determine the scope of Adams' invention. Before doing so, we pause to express our distaste for the state of the law and practice in the definition of inventions. By a most curious system of claims and their treatment in the Patent Office we have done our best to thoroughly obscure and confuse, both legally and factually, the inventors' actual ideas. The number of cases turning on the interpretation of claims, etc., is sufficient proof of this, if indeed any is needed. We should have supposed that an intelligent theory would require a simple statement of the facts of the invention accompanied by such diagrams, formulæ, or models as appear scientifically necessary. From that statement the Examiner could determine novelty and genius and could define in his own impartial language the exact extent of such determination. As it is now, the inventor plays a sort of game with the Examiner in which both the latter and, through him, the public lose.

The principal patent is a particularly disgraceful example of our meaning. Adams filed his specifications and drawings on October 1, 1917. He accompanied them with thirty-five claims. The patent, with eighty entirely different claims, was granted on October 28, 1930, thirteen years later. The file wrapper gives part of the history of those intervening years. The bare history of the separate claims has been condensed by the defendant in a booklet of seventy-nine pages.

It is asserted that this verbosity and this procrastination are due to the fact that Adams was a salesman of drug store supplies and therefore neither understood his own invention or the proper way of reaching the Examiner's understanding. It is said that he had no solicitor prior to his drawing the ex-army patent attorney, Lt. Harmon, to his assistance by his importunities. If this is so, he must have had an instinctive grasp of some of the finer points of the patent law, because we find him responding to the Examiner at pages 67, 68 of the file wrapper (Ex. D–AAA): "Then I could not have seen it (Oister) and the rule of publicity does not apply to the true intent of the law. I am entitled to my disclosures, as at least being the first in America."

We are not going to review the sordid pulling and hauling disclosed by the file wrapper. The Examiner in this case made a gallant fight. He finally succumbed (as all good Examiners must) under the combined weight of Lt. Harmon's draftmanship and the persuasion of the solicitors of the plaintiff company. We are not even going to try and determine which of the finally granted claims represent originals which were abandoned and represent therefore an attempt to extend the patent to include intervening art. We are satisfied to accept plaintiff's statement that the law permits any claim which is either fairly "indicated, suggested, or disclosed" by his original specifications and drawings. Of these three words, "suggest" seems, by the dictionary, to impose the least burden upon the inventor.

In the light of this rule, let us compare the original specifications and drawings with the final claims. Those original specifications and drawings seem quite plain both in their disclosure and in their suggestion. They indicate a series of long and fairly narrow cloth pockets attached to the back of the sack or clothing. These pockets are in continuous series. The shroud lines are coiled in the pockets by pressing them down therein with a metal rod with a cleft at its end. Each line is apparently treated separately, but as each is coiled in all of the pockets, the result is a bunching or grouping of shroud lines in the individual pockets.

Of the eighty (God save the mark!) claims in the patent, sixteen are relied upon and five called typical. We think that any claims which use such broad language as "pieces of flexible material," "releasable retaining means," "loops," etc., must be rejected as not even suggested (hinted at) by

the drawings and specifications. In other words, Adams' creative process extended to long cloth pockets as the word "pocket" is used in the garment trade and no further. The provision of an instrument to insert the line is a plenary indication of the character of the separating means. A rod at all establishes a narrow opening and a long one signifies depth.

Are such pockets anticipated by the three prior art patents to Van Meter, Calthrop, and Oister? The Patent Examiner thought so. He thought so for thirteen years. We think so. We have thought so for thirteen months. His reflections were being constantly interrupted by the arguments and elaborations of the applicant and his patent attorneys, volunteer or otherwise. That is the present patent office system. Our reflections have been continuous and unbroken. That is the judicial system. We have permitted those reflections to extend to the limit of time in which the plaintiff will suffer no delay in ultimate disposition. The Patent Examiner, like the stone, was worn away. We can only be reversed.

Van Meter and Calthrop show bundles of lines. They show elastics and threads as restraining means. Van Meter taught grooves over tubes. The coiling in grooves of Van Meter would seem to us to cause as orderly an emergence of the lines as the "bight" system of Adams. If that is not absolutely so, we do not think the pocketed bight is the kind of an improvement of the grooved coil that carries the necessary touch of genius. If that again is not absolutely so, it is an improvement of a kind that must be limited in scope by that prior art. In our opinion, the defendant's structure of narrow snap-fastened strips is outside that limitation and he does not, therefore, infringe. In either aspect the plaintiff is out.

We do not pass upon defendant's claim of lack of utility. The proceedings were enlivened by moving pictures of jumps with Adams' pack that seemed to be good or bad according to the side that supervised them. The defendant's experiments were conducted with the enthusiastic co-operation of the interested Army. They apparently held the view that a very large majority of the members of the Caterpillar Club are either very impetuous or else too much pressed for time to linger on the order of their going. This because nearly all the jumps were arranged mechanically so that the dummy would start away head first. In fact, so careful were they to make sure of such an ungraceful method of departure into space that the harness was both attached to a ring in the stern of the dummy and its feet were equipped with a pilot parachute. This position of the dummy (or jumper) has the effect, in the defendant's view, of pulling the shroud lines against the pockets and so causing them to resist the pull of the canopy for a fatal length of time. Maybe so, but we have the impression that the wish is too much the father of the thought.

The second Irving Airchute patent is for an improved rip-cord handle. Here we are faced with no distressing Patent Office history. The inventor is the president of the plaintiff company, one of the leading theoretical and practical experts in the parachute field. Plaintiff has argued against the ad hominem argument. He has cited cases to support his argument. He says it is what is done and not who did it; an objective rather than subjective test. This argument, it is unnecessary to add, was addressed to the drug salesman's patent and apropos of the failure to produce the said merchandising expert. We concede that an ordinary mechanic may have his moments. We also are told that genius is the infinite capacity for taking pains. That is just what it seems to us Captain Irving has taken by his knowledge of and practice in the art.

We have seen the importance of the rip cord; no rip, no aviator. Its accessibility and operability are vital; their absence, fatal. On all modern parachute packs the rip cord terminates in a handle which is housed in the pocket on the left shoulder webbing. The art and practice prior to Irving has these handles in the shape of rings. Because the shoulder webbing of the harness is lighter and therefore better narrow, the ring and its pocket overlapped. Because it overlapped it is likely to suffer the fate of all corners. The aviator's arm may strike it and knock it out of the pocket before the crucial time. This tendency to overlap has another effect. To minimize it the ring must be kept small. Being small, the aviator's hand in its flying glove has difficulty in getting a grip.

Captain Irving squared the circle. (We discard defendant's theory that he stole the idea from an incompleted device at Wright Field. We also reject the prior patents [dumb-bell handles and what not] as non-analogous art.) He made use maybe of his knowledge of geometry and used a trapezoid shape for his handle. Immediately the straight side obviated the protuberance. By

406

the same token, the size could be increased. Result—no arms knocking out and no fingers slipping out. We concede that the change is only one of size and shape. No one had made it although many complaints certified to the need. We admit that it is a close case. Its resolvement is the old patent law imponderable. We incline away from the ordinary and decree validity and, of course in this case, infringement.

■ Defendant originally counterclaimed on two patents to Smith. The court has the impression that both parties' interest therein is of a cursory nature. Plaintiff has already abandoned his use of one of them. The other involved two improvements in a parachute pack. At best they must be considered narrow. The first improvement was for a new style of cover. It was concededly old to .pack a parachute in a container which consisted of a tray and a detachable cover. In the French patent to Froidure (not cited in the Patent Office) this cover was composed of a wear-resistent or reinforced section. According to the specification, this section could be either on the main parachute or on the pilot parachute. In the defendant's structure the pilot parachute itself seems to have been used as a cover. Such an alteration is slight and not patentable. The second improvement (claim 6). is for the use of snap fasteners instead of sewing on the pocket-forming strips. Even without the evidence as to the Russell pack, it seems unnecessary to declare that the use of the common snap-fastener (cf. gloves) to join pieces of material is ancient and almost universal. .